UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE KLINKER and DAVID KLINKER,<br><br>             Plaintiffs,<br><br>    v.<br><br>JOHNSON & JOHNSON and ETHICON, INC.,<br><br>             Defendants. | No. 2:21-cv-00817-TLN-KJN<br><br>**ORDER** |

      This matter is before the Court on Defendants Johnson & Johnson and Ethicon, Inc.'s (collectively, "Defendants" or "Ethicon"[1]) Motion for Summary Judgment. (ECF No. 10.) Plaintiffs Michelle Klinker ("Ms. Klinker") and David Klinker (collectively, "Plaintiffs") have filed an opposition. (ECF No. 18.) Defendant filed a reply. (ECF No. 23.) Also before the Court is Defendants' Motion to Exclude Case-Specific Testimony and Opinions. (ECF No. 11.) This motion is also fully briefed. (ECF Nos. 19, 24.) For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED and Motion to Exclude is DENIED as moot.

///

---

[1]     Defendants refer to themselves collectively as "Ethicon" in the instant motion. (ECF No. 10 at 1.)

1

I. **FACTUAL AND PROCEDURAL BACKGROUND**[2]

The instant action is a personal injury action premised on claims of defective warnings and defective design with respect to an Ethicon TVT[3] device to treat stress urinary incontinence. (*See* ECF No. 18.)

A. Plaintiff's Background and Dr. Hilger's Testimony

On June 20, 2007, Ms. Klinker underwent an anterior colporrhaphy and implantation of two mesh devices — the Monarc Subfascial Hammock sling and the Perigee prolapse mesh — for the treatment of her stress urinary incontinence and a grade-4 cystocele. (DSUF ¶ 1.) American Medical System ("AMS"), not Defendants, manufactured the Monarc and Perigee devices. (*Id.*) Prior to filing this suit, Plaintiffs settled their claims against AMS. (*Id.* at ¶ 2.) From April to June 2010, Ms. Klinker presented to Dr. Wesley Scott Hilger ("Dr. Hilger") with complaints of pelvic pain, urinary urgency, dyspareunia (pain with intercourse), and recurring urinary tract infections and yeast infections, all of which she had been experiencing since implantation of the Monarc and Perigee meshes. (*Id.* at ¶ 3.)

In 2010, Dr. Hilger determined that Ms. Klinker's dyspareunia was likely caused by her AMS mesh implants.[4] (*Id.* at ¶ 4.) On June 8, 2010, Dr. Hilger surgically removed Ms. Klinker's AMS mesh implants and implanted Ethicon's TVT to treat her recurrent urinary stress incontinence.[5] (*Id.* at ¶ 5.) Prior to recommending the TVT to Ms. Klinker, Dr. Hilger took into

---

[2] The following facts are undisputed unless otherwise noted and are taken largely verbatim from Defendants' Statement of Uncontroverted Material Facts ("DSUF," ECF No. 10-1.)

[3] None of the parties identify in their briefing what TVT stands for. (ECF Nos. 10, 18, 23.) However, the Court finds this is immaterial to resolution of the instant motion.

[4] Plaintiffs dispute this point, noting that Dr. Hilger determined the 2007 implant might be causing Ms. Klinker some discomfort and the 2007 implant was not the Ethicon TVT implant. (Plaintiffs' Response to Defendants' Statement of Uncontroverted Material Facts ("PR"), ECF No. 18-7 ¶ 4.) The Court agrees with Defendants that Plaintiffs do not actually contradict this fact, but rather "Dr. Hilger's testimony cited by Plaintiffs further demonstrates that the complication experienced by Ms. Klinker during the 2010 exam could not have been the TVT because it had not yet been implanted." (Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Uncontroverted Material Facts ("DR"), ECF No. 23-1 ¶ 4.)

[5] Plaintiffs dispute this point, but only repeat the facts stated and add that the goal of the

consideration the fact that she had already been implanted with two other mesh devices and was already complaining of pain, dyspareunia, and urinary urgency. (*Id.* at ¶ 6.) Dr. Hilger testified in his deposition that he did not recall having ever read the Instructions for Use ("IFU") for TVT prior to implanting the device in Ms. Klinker.[6] (*Id.* at ¶ 7.) Dr. Hilger did not rely on Ethicon's warnings for the device when implanting Ms. Klinker's TVT, stating: "By that time, I had been through fellowship and had been in practice for four years . . . So I was really relying on my own training and research that I had done and the research that I had heard at those meetings . . . I hadn't really relied on the manufacturer, by that time, for anything." (*Id.* at ¶ 8.) Instead, Dr. Hilger learned of the potential risks "associated with the use of mesh" during his fellowship. (*Id.* at ¶ 9.) He became familiar with various potential risks, including acute or chronic pain with intercourse, acute or chronic pain, vaginal scarring, infection, urinary problems (including frequency, urgency, dysuria, retention, or obstruction and incontinence), organ or nerve bleeding, wound complications, inflammation, fistula formation, neuromuscular problems, one or more surgeries required to treat adverse events, recurrence or failure, foreign body response to mesh, erosion, exposure, or extrusion of mesh, and contraction or shrinkage issues. (*Id.*) Dr. Hilger also reviewed literature and studies to understand the rates of these potential risks, and he did not rely on Ethicon to inform him of the rates. (*Id.* at ¶ 10.)

On June 28, 2013, Dr. Hilger performed another surgery on Ms. Klinker to revise a portion of the TVT and remove a urethral diverticulum.[7] (*Id.* at ¶ 11.) The symptoms of a

---

procedure was also to reduce her dyspareunia and pelvic pain. (PR ¶ 5.) The Court will therefore consider this fact undisputed for the purpose of the instant motion.

[6] Plaintiffs dispute this point, noting Dr. Hilger stated he was familiar with TVT's IFU and he was trained at the Mayo Clinic to use the product. (PR ¶ 7.) Plaintiffs also dispute the facts set forth in paragraphs 8 through 10 on the same basis, arguing Dr. Hilger was familiar with the TVT's IFU. (*Id.* at ¶¶ 8–10.) Regarding paragraphs 7 through 10, the Court agrees with Defendants that the testimony to which Plaintiffs cite in support of this point "describes Dr. Hilger's general response to manufacturers and their warnings" and "[t]hese general observations and preferences do not change the fact that Dr. Hilger testified repeatedly that he did not remember reading TVT's IFU." (DR ¶ 7.) The Court also agrees that this alleged dispute does not contradict the facts asserted. (*Id.* at ¶¶ 8–10.)

[7] Plaintiffs dispute this point, but only repeat the facts stated and add that Dr. Hilger also

3

urethral diverticulum include pain, urinary tract infections, and urinary leakage. (*Id.*) Dr. Hilger testified he had no reason to believe the TVT caused the urethral diverticulum. (*Id.*) On February 2, 2017, Dr. Hilger performed a third surgery on Ms. Klinker to lyse pelvic adhesions, excise a portion of the TVT, and remove a Prolene suture likely associated with Ms. Klinker's AMS mesh implants.[8] (*Id.* at ¶ 12.)

Dr. Hilger stands by his decision to implant Ms. Klinker's TVT in 2010, and even knowing that she was suffering from chronic pain in 2010, he still thinks TVT was "the best option" for her treatment.[9] (*Id.* at ¶ 13.) To this day, Dr. Hilger still uses TVT, as he stated: "[f]or urinary stress incontinence, I think TVT is the most helpful for treating that condition surgically." (*Id.* at ¶ 14.) Dr. Hilger regards TVT as the "current" "gold standard" treatment. (*Id.*) Plaintiffs allege Ms. Klinker sustained the following injuries from her TVT: yeast infections, pain, painful intercourse, infections, bleeding, depression, urinary dysfunction and incontinence, and anxiety.[10] (*Id.* at ¶ 15.) Dr. Hilger does not believe TVT is causing Ms. Klinker's current pain, including her pelvic pain or her urinary urgency.[11] (*Id.* at ¶ 16.)

---

performed a repair of urethral diverticulum and cystourethroscopy. (PR ¶ 11.) The Court will therefore consider this fact undisputed for the purpose of the instant motion.

[8]  Plaintiffs dispute this point, but only repeat the facts stated and add that Dr. Hilger also performed a removal of right vaginal mesh, cystoscopy, and repair of vaginal exploration. (PR ¶ 12.) The Court will therefore consider this fact undisputed for the purpose of the instant motion.

[9]  Plaintiffs dispute this point as well as the point made in paragraph 14, stating that Dr. Hilger made this statement in 2019, so it is unclear what might have transpired in the past three years. (PR ¶¶ 13–14.) The Court agrees with Defendants that Plaintiffs offer no evidence to dispute this fact and it is their burden to establish all the elements of their claims. (DR ¶¶ 13–14.) Accordingly, the Court will consider this fact undisputed for the purpose of the instant motion.

[10]  Plaintiffs dispute this point, but only repeat the facts stated and add that Ms. Klinker sustained other injuries, such as diverticulum, bowel problems/spasms, and no muscle control. (PR ¶ 11.) The Court will therefore consider this fact undisputed for the purpose of the instant motion.

[11]  Plaintiff disputes this point, stating that their expert Dr. Bruce Patsner ("Dr. Patsner") does not agree. (PR ¶ 16.) The Court finds that Plaintiff's argument does not contradict Dr. Hilger's opinion, but is instead simply the opinion of another expert. (DR ¶ 16.) The Court will therefore consider this fact undisputed for the purpose of the instant motion.

B.  Plaintiff's Expert Opinions

Plaintiffs' sole expert, Dr. Patsner, does not identify any specific defects in TVT's design, nor does he opine that any specific defect caused Ms. Klinker's alleged injuries. (*Id.* at ¶ 17.) Instead, Dr. Patsner testified that he was "not offering the opinion that a specific defect in TVT is what caused [Ms. Klinker's] complications" and he is "not attributing a specific design[] defect in the mesh to her complications."[12] (*Id.*) Moreover, Dr. Patsner has no opinions to offer about "specific mesh properties or characteristics," including no critique of the "choice of mesh, its weave, its pore size, its fiber size, its diameter or any mesh properties generally about the TVT." (*Id.* at ¶ 18.) Dr. Patsner is not familiar with the specific mesh characteristics of TVT.[13] (*Id.*)

Instead, Dr. Patsner opines only that "the injuries sustained by Ms. Klinker — vaginal pain, dyspareunia, and mesh exposure are all the direct result of the implanted mesh" and "pain/dyspareunia the patient [sic] developed by Ms. Klinker were the direct result of mesh placement, and required a second, and later a third operation." (*Id.* at ¶ 19.) When asked in deposition what he meant in opining "the implanted mesh" caused Ms. Klinker's injuries, Dr. Patsner admitted, "I say implanted mesh, and that's a very broad non-specific statement, and it was written that way because it is not clear what caused what in this patient." (*Id.* at ¶ 20.) When specifically asked about evidence linking Ms. Klinker's claimed complications to TVT, Dr.

---

[12]  Plaintiffs dispute the point made in paragraph 17, stating that Dr. Patsner attributed Ms. Klinker's injuries to the implantation of mesh, meaning both the AMS mesh and the Ethicon TVT mesh. (PR ¶ 17.) Plaintiffs further note that Dr. Patsner based his report, within a reasonable degree of medical certainty, on review of Ms. Klinker's medical records, including surgical reports, history of complaints, laboratory and pathology reports, and his education and experience in the field. (*Id.*) Plaintiffs state Dr. Patsner's opinion was based on a differential diagnosis. (*Id.*) The Court agrees with Defendants that Plaintiffs' argument does not contradict Dr. Patsner's testimony and they have not stated anything about what Dr. Patsner reviewed or how he performed his review. (DR ¶ 17.) Defendants also note that Plaintiffs' expert is unable to contradict this testimony. The Court will therefore consider this fact undisputed for the purpose of the instant motion.

[13]  Plaintiffs dispute the point made in paragraphs 18 and 19, stating that Dr. Patsner identified the defect that he believes caused each of Ms. Klinker's injuries: exposure to the Ethicon TVT Sling. (PR ¶ 18–19.) The Court agrees with Defendants that Plaintiffs' argument does not actually contradict Dr. Patsner's testimony. (DR ¶ 18–19.) The Court will therefore consider this fact undisputed for the purpose of the instant motion.

Patsner replied, "[I]t's not really clear from her last operative report and the surgery that was done exactly what symptomatology she might or might not have had that could be attributed to her TVT."[14]  (*Id.*)

Dr. Patsner cannot state to a reasonable degree of medical certainty that Ms. Klinker's pain, including vaginal pain and dyspareunia, or urethral diverticulum were caused by her TVT — as opposed to her AMS mesh products.  (*Id.* at ¶ 21.)  He does not attribute recurrent urinary tract infections or mesh exposure to TVT.  (*Id.*)  Further, Dr. Patsner found no objective evidence in Ms. Klinker's medical records of: mesh degradation; cytotoxicity; abnormal chronic inflammatory reaction or foreign body reaction; mesh roping, fraying, or curling; or mesh shrinkage or contraction.  (*Id.*)  Generally, Dr. Patsner agrees that "there's at least a moderate consensus in the medical literature that the use of synthetic retropubic slings at present is an acceptable treatment for stress urinary incontinence . . . both in terms of efficacy and safety."[15]  (*Id.* at ¶ 22.)

### C. Procedural History

Plaintiffs filed the instant action on May 4, 2021.  (ECF No. 1.)  Plaintiffs allege three claims: (1) negligence for failure to warn and design defect; (2) strict liability for failure to warn; and (3) loss of consortium.  (*Id.*)  Defendants filed the instant motion for summary judgment and the instant motion to exclude on October 22, 2021.  (ECF Nos. 10, 11.)  Because the Court

---

[14]  Plaintiffs dispute the points made in paragraphs 20 and 21, stating that Dr. Patsner identified the defect that he believes caused each of Ms. Klinker's injuries: exposure to the Ethicon TVT Sling.  (PR ¶¶ 20–21.)  Plaintiffs notes that Dr. Patsner testified regarding his review of the records of the 2017 surgery that the doctor "clearly found what he thought was part of the TVT which was stuck to something which was scarred down which he removed, and based on the description of that and the location and the way he described excising it, it would at least strongly suggest that that was a contributory thing towards causing discomfort."  (*Id.* (citing ECF No. 18-5 at 27).)

[15]  Plaintiffs dispute this point, stating that Dr. Patsner also mentioned that there is a great deal of controversy over the use of synthetic mesh kits for pelvic organ prolapse.  (PR ¶ 22.)  Defendants contend this fact does not contradict its stated fact, adds irrelevant information, and the mesh device implanted to treat Ms. Klinker's prolapse was not manufactured by Defendants but by AMS.  (DR ¶ 22.)  The Court agrees with Defendants that Plaintiffs do not contradict this point.  The Court will therefore consider this fact undisputed for the purpose of the instant motion.

1 concludes Defendants' motion for summary judgment should be granted even considering the
2 evidence Defendants seek to exclude, the Court need not and does not address the motion to
3 exclude.

4       **II.**      **STANDARD OF LAW**

5       Summary judgment is appropriate when the moving party demonstrates no genuine issue
6 of any material fact exists and the moving party is entitled to judgment as a matter of law. Fed.
7 R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Under summary
8 judgment practice, the moving party always bears the initial responsibility of informing the
9 district court of the basis of its motion, and identifying those portions of "the pleadings,
10 depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"
11 which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v.*
12 *Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof
13 at trial on a dispositive issue, a summary judgment motion may properly be made in reliance
14 solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at
15 324 (internal quotation marks omitted). Indeed, summary judgment should be entered against a
16 party who does not make a showing sufficient to establish the existence of an element essential to
17 that party's case, and on which that party will bear the burden of proof at trial.

18       If the moving party meets its initial responsibility, the burden then shifts to the opposing
19 party to establish that a genuine issue as to any material fact does exist. *Matsushita Elec. Indus.*
20 *Co. v. Zenith Radio Corp.* (*Matsushita*), 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v.*
21 *Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this
22 factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required
23 to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material,
24 in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c). The opposing party
25 must demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome
26 of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986),
27 and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a
28 verdict for the nonmoving party. *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587.

**III.   ANALYSIS**

Defendants move for summary judgment as to all of Plaintiff's claims. (ECF No. 10.) The Court will address Plaintiffs' failure to warn claims, design defect claim, and loss of consortium claim in turn.

    A. <u>Failure to Warn Claims</u>

Defendants move for summary judgment as to Plaintiffs' failure to warn claims because there is insufficient evidence showing causation. (ECF No. 10 at 7.) More specifically, Defendants argue Plaintiffs cannot show that Dr. Hilger, the implanting physician, read or relied on Defendants' warnings. (*Id.* at 8.) Defendants also argue Plaintiffs cannot prove that different

1 warnings would have changed Dr. Hilger's prescribing decision. (*Id.* at 10.)

2 The parties agree that California's learned intermediary doctrine applies to Plaintiffs'
3 failure to warn claims.[16] (ECF No. 10 at 7; ECF No. 18 at 10.) "California's learned
4 intermediary doctrine holds that a manufacturer of prescription drugs or medical devices satisfies
5 its duty to warn when it provides adequate warnings to the prescribing physician, as opposed to
6 the patient." *Enborg v. Ethicon, Inc.*, No. 2:20-CV-02477-AWI-BAK, 2022 WL 800879, at *19
7 (E.D. Cal. Mar. 16, 2022) (citations omitted). "Under the learned intermediary doctrine, a
8 plaintiff must prove 'not only that no warning was provided or that the warning was inadequate,
9 but also that the inadequacy or absence of the warning caused the [plaintiff's] injury.'" *Id.*
10 (quoting *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001), *aff'd sub nom. Motus v.*
11 *Pfizer Inc.*, 358 F.3d 659 (9th Cir. 2004)). "A product defect claim based on insufficient
12 warnings cannot survive summary judgment if stronger warnings would not have altered the
13 conduct of the prescribing physician." *Motus*, 358 F.3d at 661.

14 In arguing there is no evidence Dr. Hilger read or relied on Defendants' warnings,
15 Defendants cite the following excerpts of Dr. Hilger's deposition testimony:

16     1. Dr. Hilger did not remember reading the IFU prior to implanting the TVT in Ms.
17        Klinker (ECF No. 10-4 at 25);

18     2. When asked how he knew about the manufacturer's warnings for the TVT, he stated,
19        "By that time, I had been through fellowship and been in practice for four years, been
20        to several meetings. So I was really relying on my training and the research I had
21        done and the research I had heard at those meetings . . . and the articles I had read. I
22        hadn't really relied on the manufacturer, by that time, for anything" (*id.* at 25, 28);

23     3. Dr. Hilger learned of potential risks "associated with the use of mesh" during his
24        fellowship (*id.* at 14); and

---

[16] Plaintiffs allege a strict liability claim for failure to warn (Claim One) and a negligence claim for failure to warn (Claim Two). (ECF No. 1.) The learned intermediary doctrine applies to both. *See Enborg v. Ethicon, Inc.*, No. 2:20-CV-02477-AWI-BAK, 2022 WL 800879, at *20 (E.D. Cal. Mar. 16, 2022) ("The learned intermediary doctrine applies to implanted medical devices, and it covers failure to warn claims under both the strict liability theory and the negligence theory.") (internal citations omitted).

9

    4. Dr. Hilger also reviewed literature and studies to understand the rate of the potential risks, and he did not rely on Ethicon to inform him of the rates (*id.*).

In arguing there is no evidence that different warnings would have changed Dr. Hilger's prescribing decision, Defendants point to multiple excerpts from Dr. Hilger's deposition, where he testified that:

    1. He understood Ms. Klinker was suffering from chronic pain in June 2010 and still believed TVT was the best option for Ms. Klinker (ECF No. 10-4 at 20);

    2. He stood by his decision to use the TVT with Ms. Klinker, continued to use TVT after Ms. Klinker's surgery, and still believed TVT to be the best as far as surgical options to treat Ms. Klinker's condition (*id.* at 21);

    3. He still held the opinion that even though sometimes mesh must be explanted or taken out, TVT was the best option for Ms. Klinker (*id.* at 28); and

    4. He believed TVT was the most helpful for treating urinary stress incontinence surgically and regarded TVT as the gold standard treatment (*id.* at 11, 16).

Based on the foregoing evidence, the Court concludes Defendants have met their initial burden of showing there is an absence of evidence as to causation. *See Celotex*, 477 U.S. at 324–25 (where the non-moving party will have the burden of proof at trial, the movant can satisfy its initial burden by pointing out that there is an absence of evidence to support the non-moving party's case). Accordingly, the burden shifts to Plaintiff to establish a genuine issue of material fact as to causation.

Plaintiffs argue Dr. Hilger's testimony creates an issue of fact as to whether he "relied on accurate information from the manufacturer to make correct risk-benefit decisions for his patients." (ECF No. 18 at 10.) Plaintiffs cite the following excerpts from Dr. Hilger's deposition:

    1. Dr. Hilger met with Defendants' sale representatives regarding the TVT product (ECF No. 10-4 at 23);

    2. When Dr. Hilger is not trained on a device, he would read the IFU (*id.* at 25);

    3. Dr. Hilger could not remember if he ever received an IFU from Ethicon sales representatives (*id.*);

10

4. When he was implanting the TVT in Plaintiff in June 2010, Dr. Hilger "hadn't really relied on the manufacturer, *by that time*, for anything" (*id.* (emphasis added));

5. Dr. Hilger never received any warning from Ethicon regarding the risks of smoking and complications with TVT implants (*id.* at 24); and

6. Dr. Hilger "relies on the manufacturer to provide him with adequate warnings regarding known risks, he expects a manufacturer to put all relevant information in a warning, and he wants as much information about a product before implanting it into a patient" (*id.* at 25).

Construing the evidence in the light most favorable to Plaintiffs, there is perhaps a reasonable inference that Dr. Hilger generally relied on manufacturer warnings and was at some point aware of Defendants' warnings regarding the TVT. However, as to Ms. Klinker's case specifically, Plaintiffs' evidence is insufficient to raise a triable issue as to whether Dr. Hilger relied on Defendants' warnings and whether different warnings would have changed Dr. Hilger's prescribing decision. Dr. Hilger clearly testified he did not rely on Defendants' warnings in 2010 and instead relied on his own training and research. Moreover, as Defendants correctly point out, Plaintiffs have not presented testimony that any different warning would have changed Dr. Hilger's prescribing decision.

For these reasons, Plaintiffs fail to meet their shifted burden to show there is a triable issue of fact as to causation. *See Latiolais v. Merck & Co., Inc.*, 302 F. App'x. 756, 757 (9th Cir. 2008) (affirming summary judgment for defendant where deposition testimony of prescribing physician indicated that drug warnings "did not play a role in his decision to prescribe" the drug); *Brennan v. Johnson & Johnson*, No. 5:20-CV-01954-FWS-KK, 2022 WL 17219513, at *13 (C.D. Cal. Nov. 18, 2022) ("Here, as in *Motus*, the court finds that there is no affirmative testimony from Dr. Winesburg that she would have acted differently given a different warning from Defendants."); *Enborg*, 2022 WL 800879, at *21 (holding that plaintiff did not establish causation where her physician testified that he relied "minimally" on the manufacturer for information about the product, continued to use the product, and stood by his decision to recommend and use the product for plaintiff).

11

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiffs' failure to warn claims.

### B. Design Defect Claim

Defendants argue Plaintiffs' design defect claim fails on the element of causation because Plaintiffs' sole expert — Dr. Patsner — cannot connect any of Plaintiffs' injuries to TVT itself, much less to a specific defect in TVT.[17]  (ECF No. 10 at 11.)

"A product liability case must be based on substantial evidence establishing both the defect and causation (a substantial probability that the design defect, and not something else, caused the plaintiff's injury) and where . . . the complexity of the causation issue is beyond common experience, expert testimony is required to establish causation." *Marmont v. Bernzomatic Corp.*, 2018 WL 6252500, at *14 (C.D. Cal. July 31, 2018) (quoting *Stephen v. Ford Motor Co.*, 134 Cal. App. 4th 1363, 1373 (2005) (internal quotation marks omitted)).

In arguing there is an absence of evidence that a design defect in the TVT caused Plaintiffs' injury, Defendants cite the following evidence:

1. In his report, Dr. Patsner does not identify any specific defects in TVT's design, nor does he opine that any specific defect caused Ms. Klinker's alleged injuries (ECF No. 18-2);

2. Dr. Patsner opines only that, "the injuries sustained by Ms. Klinker — vaginal pain, dyspareunia, and mesh exposure are all the direct result of the implanted mesh," and "pain/dyspareunia the patient [sic] developed by Ms. Klinker were the direct result of mesh placement, and required a second, and later a third operation" (*id.*);

3. When asked what he meant in opining "the implanted mesh" caused Ms. Klinker's injuries, Dr. Patsner admitted, "I say implanted mesh, and that's a very broad non-specific statement, and it was written that way because it is not clear what caused what in this patient" (ECF No. 18-5 at 13, 40–41);

---

[17]  Defendants move to exclude Dr. Patsner's report and testimony. (ECF No. 11.)  Because the Court finds Dr. Patsner's report and testimony are insufficient to preclude summary judgment, the Court need not and does not address whether his opinions are admissible.

12

4. During his deposition, Dr. Patsner testified that he was "not offering the opinion that a specific defect in TVT is what caused [Ms. Klinker's] complications," and he is "not attributing a specific design defect in the mesh to her complications" (*id.* at 5, 44);

5. Dr. Patsner offers no opinion as to "specific mesh properties or characteristics" (*id.* at 6–7, 21);

6. When specifically asked about evidence linking Ms. Klinker's claimed complications to TVT, Dr. Patsner replied, "[I]t's not really clear from her last operative report and the surgery that was done exactly what symptomatology she might or might not have had that could be attributed to her TVT" (*id.* at 13); and

7. Dr. Patsner cannot state to a reasonable degree of medical certainty that Ms. Klinker's pain, including vaginal pain and dyspareunia, or urethral diverticulum were caused by her TVT — as opposed to her AMS mesh products. He does not attribute recurrent urinary tract infections or mesh exposure to TVT, and he found no objective evidence in Ms. Klinker's medical records of mesh degradation, cytotoxicity, abnormal chronic inflammatory reaction or foreign body reaction, mesh roping, fraying, or curling, or mesh shrinkage or contraction (*id.* at 12, 13, 20, 24, 27, 28, 31, 41).

Based on the foregoing evidence, the Court concludes Defendants have met their initial burden of showing there is an absence of evidence as to causation. *See Celotex*, 477 U.S. at 324–25. Accordingly, the burden shifts to Plaintiff to establish a genuine issue of material fact as to causation.

Plaintiffs argue Dr. Patsner's report and deposition testimony "provide sufficient evidence that the design defects of the TVT caused Plaintiff's injuries." (ECF No. 18 at 14.) Plaintiffs cite the following excerpts from Dr. Patsner's report and deposition:

1. Dr. Patsner opined in his report, "It is my opinion that the injuries sustained by Ms. Klinker — vaginal pain, dyspareunia, and mesh exposure are all the direct result of the implanted mesh" (ECF No. 18-2 at 5);

2. Dr. Patsner opined in his report, "The pain/dyspareunia the patient developed were the direct result of mesh placement" (*id.* at 6);

13

3. When asked during his deposition if it was "fair to say that the records available for your review are somewhat confusing and contradictory and don't really allow you to say here's the definitive source of her pelvic pain and dyspareunia," Dr. Patsner responded, "Well, I think what we can say is [Dr. Hilger] clearly found, as he states, assuming he didn't mistake one thing for something else, he clearly found what he thought was part of the TVT which was stuck to something which was scarred down which he removed, and based on the description of that and the location and the way he described excising it, it would at least strongly suggest that was a contributory thing towards causing discomfort" (ECF No. 18-5 at 27); and

4. When asked if "it would be speculation to say that [Ms. Klinker's] urethral diverticulum was caused by the TVT," Dr. Patsner responded, "So the answer to that actually is a little tricky because if you had . . . let's say you had a Product No. 1 in, and you removed Product No. 1 in toto, and then you do another operation and you insert a second product, and you develop something in that surgical area, logically it doesn't make sense to say that it was caused by the first thing if the first thing no longer existed" (*id.* at 13).

In arguing this is sufficient to preclude summary judgment, Plaintiffs cite *Shahbaz v. Johnson & Johnson*, No. CV 13-07382-AB (SSX), 2020 WL 5894590 (C.D. Cal. July 31, 2020), which was a case about injuries allegedly caused by an Ethicon soft mesh device. (ECF No. 18 at 15.) The Court finds *Shahbaz* to be distinguishable. In *Shahbaz*, the court held that the plaintiffs' expert report created a triable issue of fact as to whether the product had a design defect that caused the plaintiffs' injuries. *Id.* at *17. Unlike Dr. Patsner's report, however, the expert report in *Shahbaz* identified seven specific defects in the product and opined that those specific defects caused the plaintiffs' injuries. *Id.* In contrast, Dr. Patsner's report does not identify any design defects in the TVT and instead offers the conclusory opinion that Ms. Klinker's injuries were caused by "the implanted mesh" and "mesh placement" without even identifying a particular product.

///

14

Moreover, in Dr. Patsner's deposition testimony, he offered no opinion as to whether any specific design defect in the TVT caused Ms. Klinker's injuries, offered no opinion about the specific characteristics of the TVT, and repeatedly indicated he could not determine what caused Ms. Klinker's injuries. Although Plaintiffs rely on Dr. Patsner's testimony that Dr. Hilger "found what he thought was part of the TVT which was stuck to something which was scarred down" that "would at least strongly suggest that [the TVT] was a contributory thing towards causing discomfort," Plaintiffs fail to explain how this vague testimony establishes a causal link between a specific design defect in the TVT and Ms. Klinker's injuries. Defendants also point out in reply that Dr. Patsner's further testimony on this subject revealed that he could not say whether mesh being removed was from the TVT or from one of the AMS products. (ECF No. 18-5 at 27–28, 30–31.) Plaintiffs' citation to Dr. Patsner's response to being asked whether Ms. Klinker's urethral diverticulum was caused by the TVT is similarly unavailing, as Dr. Patsner subsequently clarified that he did not know if the TVT caused the urethral diverticulum. (*Id.* at 13.) For these reasons, the Court concludes Plaintiffs fail to present sufficient evidence to raise a triable issue of fact as to whether a design defect in the TVT caused Ms. Klinker's injuries.

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiffs' design defect claim.

C. Loss of Consortium Claim

Defendants move for summary judgment as to Plaintiffs' loss of consortium claim because it is derivative of Plaintiffs' other claims, which fail as a matter of law. (ECF No. 10 at 13.) Plaintiffs do not address this claim in their opposition. Because the loss of consortium is derivative of Plaintiffs' other claims, it too fails. (ECF No. 1 at 24.)

Therefore, the Court GRANTS Defendants' motion for summary judgment as to Plaintiffs' loss of consortium claim.

///
///
///
///

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is hereby GRANTED. (ECF No. 10.) Defendants' Motion to Exclude is DENIED as moot. (ECF No. 11.) The Clerk of Court is directed to enter judgment in Defendants' favor and close the case.

IT IS SO ORDERED.

DATED: January 19, 2023

Troy L. Nunley
United States District Judge